# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE TEMPUR SEALY
INTERNATIONAL, INC.
SECURITIES LITIGATION

Civil Action No.: 1:17-cv-02169-LAK

**CONSOLIDATED CLASS ACTION
COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

**LABATON SUCHAROW LLP**
Michael W. Stocker
Alfred L. Fatale III
Ross M. Kamhi
Eric Gottlieb
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: mstocker@labaton.com
        afatale@labaton.com
        rkamhi@labaton.com
        egottlieb@labaton.com

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 2

II.     JURISDICTION AND VENUE ......................................................................... 4

III.    THE PARTIES.................................................................................................... 5

        A.      Lead Plaintiff ......................................................................................... 5

        B.      Defendants ............................................................................................. 5

IV.     FACTUAL ALLEGATIONS ............................................................................ 8

        A.      Tempur Sealy's Background and Business Overview............................ 8

        B.      Tempur Sealy's Relationship with Mattress Firm ................................ 9

        C.      Mattress Firm's Acquisition of Sleepy's ............................................ 10

        D.      Mattress Firm is Acquired By Steinhoff, a Vertically Integrated
                Mass-Market Retailer, and Flips the Script on Tempur Sealy's
                Negotiating Tactics ............................................................................. 12

        E.      Tempur Sealy Conceals the Material Risk That It Would  Have to
                Terminate Its Relationship with Mattress Firm .................................. 18

        F.      Tempur Sealy Terminates its Contracts with Mattress Firm ............... 20

        G.      Mattress Firm Sues Tempur Sealy for Breach of Contract.................. 22

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING
        STATEMENTS AND OMISSIONS ................................................................ 23

        A.      September 9, 2016 Registration Statement.......................................... 23

        B.      September 14, 2016 Prospectus ........................................................... 26

        C.      September 27, 2016 Press Release........................................................ 27

        D.      September 27, 2016 Deutsche Bank Leveraged Finance
                Conference ........................................................................................... 28

        E.      October 27, 2016 Press Release and Earnings Call ............................ 30

        F.      November 4, 2016 Third-Quarter Form 10-Q ..................................... 33

VI.     ADDITIONAL ALLEGATIONS OF SCIENTER.......................................... 35

VII.     LOSS CAUSATION ................................................................................................ 36

VIII.    PRESUMPTION OF RELIANCE ......................................................................... 37

IX.      INAPPLICABILITY OF THE STATUTORY SAFE  HARBOR AND
         BESPEAKS CAUTION DOCTRINE ................................................................. 39

X.       CLASS ACTION ALLEGATIONS ..................................................................... 40

XI.      CAUSES OF ACTION .......................................................................................... 42

         COUNT I FOR VIOLATIONS OF SECTION 10(b) OF THE
         EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED
         THEREUNDER (Against Defendant Tempur Sealy and the Individual
         Defendants) ............................................................................................................ 42

         COUNT II FOR VIOLATIONS OF SECTION 20(a) OF THE
         EXCHANGE ACT (Against Defendants Thompson and Hytinen) ................. 45

XII.     PRAYER FOR RELIEF ........................................................................................ 47

XIII.    JURY TRIAL DEMANDED ................................................................................. 48

Lead Plaintiff, Oklahoma Police Pension and Retirement System, by its undersigned

counsel, brings this action under Sections 10(b) and 20(a) of the U.S. Securities Exchange Act of

1934 (the "Exchange Act"), and Securities and Exchange Commission (the "SEC") Rule 10b-5

promulgated thereunder, on behalf of itself and all others similarly situated who purchased or

otherwise acquired the publicly traded securities of Tempur Sealy International, Inc. ("Tempur

Sealy" or the "Company") between September 9, 2016 and January 27, 2017, inclusive (the

"Class Period").

Lead Plaintiff alleges the following upon personal knowledge as to itself and its own acts,

and upon information and belief as to all other matters.  Lead Plaintiff's information and belief

are based on, among other things, the independent investigation of Court-appointed Lead

Counsel, Labaton Sucharow LLP.  This investigation has included a review and analysis of:

(i) public filings by Tempur Sealy with the SEC; (ii) public reports and news articles;

(iii) research reports by securities and financial analysts; (iv) economic analyses of securities

movement and pricing data; (v) transcripts of investor calls with Tempur Sealy senior

management; (vi) interviews with former employees of Tempur Sealy and former employees of

the Company's customers; (vii) public filings in lawsuits between Tempur Sealy and Mattress

Firm Holding Corp. ("Mattress Firm"); and (viii) other publicly available material and data

identified herein.  Lead Counsel's investigation into the factual allegations contained herein is

continuing, and many of the facts supporting the allegations contained herein are known only to

the Defendants (as defined herein) or are exclusively within their custody or control.  Lead

Plaintiff believes that further substantial evidentiary support will exist for the allegations

contained herein after a reasonable opportunity for discovery.

## I.   <u>INTRODUCTION</u>

1.    Tempur Sealy, a mattress and bedding-products company, sells the vast majority of its products through a small handful of mattress retailers.  Throughout the Class Period, and until recently, sales to Mattress Firm accounted for over 20% of the Company's sales, making it Tempur Sealy's largest customer.  Tempur Sealy regularly touted the importance and long-term nature of its relationship with Mattress Firm.

2.    In February 2016, Mattress Firm further solidified its place as Tempur Sealy's most important customer when it acquired Sleepy's—another one of the Company's top customers.  Mattress Firm's acquisition of Sleepy's was part of its efforts to grow its national footprint through organic growth and acquisition of other mattress retailers.  This acquisition meant that Mattress Firm had become a nationwide retailer with over 20% market share, which enhanced its buying power, but also meant that Mattress Firm would face certain short-term challenges as it integrated these new stores.

3.    Tempur Sealy sought to capitalize on Mattress Firm's short-term vulnerability to negotiate more favorable terms.  Indeed, according to a lawsuit Mattress Firm filed in March 2017 against Tempur Sealy, beginning in early 2016, Tempur Sealy "***threatened to cancel [its] existing agreements [with Mattress Firm]*** unless Mattress Firm agreed to revise or renegotiate their existing deal to incorporate economic terms that were increasingly favorable to Tempur Sealy."[1]  This negotiating tactic was "strategically timed to threaten crucial events in Mattress Firm's business"—that is, the acquisition and integration of Sleepy's—and the market was unaware that Tempur Sealy had been relying on this negotiation strategy.

---

[1]    All emphasis added, unless otherwise noted.

4.     Tempur Sealy's non-public ultimatum created a risk that it would lose the relationship with Mattress Firm entirely, and this risk became material, heightened, and especially pronounced in August 2016, when Steinhoff International Holdings N.V. ("Steinhoff")—a vertically integrated retail holding company—acquired Mattress Firm.  Once part of Steinhoff, Mattress Firm's access to product was far less dependent on its relationship with Tempur Sealy.

5.     Indeed, Steinhoff's acquisition of Mattress Firm flipped the script on Tempur Sealy, because now it was Mattress Firm that was better positioned to demand favorable contract terms.  As many analysts observed, Steinhoff's vertical-integration strategy, and the enhanced buying power that comes along with it, put pressure on mattress suppliers and threatened Tempur Sealy's bargaining position, especially in the mid-to-long-term.  As a result, following the acquisition, the parties' respective negotiating positions were driven further apart, and Tempur Sealy now faced a dramatically deteriorating relationship and the material, heightened risk that it would not be able to maintain its business with Mattress Firm.  The market remained completely unaware of those intertwined developments and the immediate risks and uncertainties they created.

6.     Rather than disclose this material risk to investors, Defendants continued to tout the Company's relationship with Mattress Firm, downplaying the long-term implication of its prior negotiating tactics and Steinhoff's acquisition.  Indeed, Defendants told investors that they were "very optimistic long term" about the Company's relationship with Mattress Firm, and that, despite downward sales pressures due to Mattress Firm's acquisition of Sleepy's, sales to Mattress Firm would return to "a normal basis" in "a quarter or two."  What is more, despite announcing on September 27, 2016 that the Company would have to lower its full-year 2016

guidance, in part due to the "transitions" Mattress Firm experienced after acquiring Sleepy's and subsequently having been acquired by Steinhoff, Defendants assured the market that sales to Mattress Firm would "improv[e] in 2017."

7.      When on January 30, 2017, Tempur Sealy announced that it had lost Mattress Firm as a customer, the market was shocked because it was unaware that the Company's previous undisclosed "take it or leave it" negotiations had virtually dictated this result.  The Company's stock price dropped $20.19 per share over the next two days of trading, or nearly 32%, on extremely heavy trading volume to close at $43.00 per share on January 31, 2017.

## II.      **JURISDICTION AND VENUE**

8.      The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

11.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

### III.    THE PARTIES

#### A.    Lead Plaintiff

12.    Lead Plaintiff, Oklahoma Police Pension and Retirement System ("Oklahoma Police"), is a public pension fund that has approximately $2.3 billion assets under management. On June 22, 2017, the Court appointed Oklahoma Police as Lead Plaintiff for this litigation. As set forth in the certification filed with the Court, Oklahoma Police purchased Tempur Sealy common stock during the Class Period and suffered damages as a result of Defendants' fraud.

#### B.    Defendants

13.    Defendant Tempur Sealy develops, manufactures, and distributes bedding products—primarily mattresses—worldwide. The Company maintains its principal executive offices in Lexington, Kentucky. Tempur Sealy common stock is publicly traded on the NYSE, which is an efficient market, under the ticker symbol "TPX."

14.    Defendant Scott L. Thompson is, and was at all relevant times, Tempur Sealy's President, Chief Executive Officer ("CEO"), and Chairman of its Board of Directors. As such, Thompson reviewed, approved, and signed Tempur Sealy's false and misleading SEC filings. Thompson also reviewed and approved false and misleading press releases and Forms 8-K issued by Tempur Sealy during the Class Period. Thompson also participated in conference calls with securities analysts, during which Tempur Sealy's false and misleading statements filed with the SEC and included in press releases were presented and discussed.

15.    Defendant Barry A. Hytinen is, and was at all relevant times, Tempur Sealy's Executive Vice President and Chief Financial Officer ("CFO"). As CFO, Hytinen reviewed, approved, and signed Tempur Sealy's false and misleading SEC filings. Hytinen also reviewed and approved false and misleading press releases and Forms 8-K issued by Tempur Sealy during the Class Period. Hytinen also participated in conference calls with securities analysts, during

which Tempur Sealy's false and misleading statements filed with the SEC and included in press releases were presented and discussed.

16.     Defendants Thompson and Hytinen are collectively referred to as the "Individual Defendants" and, together with Tempur Sealy, as the "Defendants."

17.     Each of the Individual Defendants, by virtue of his high-level position with Tempur Sealy, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition during his tenure with the Company, as alleged herein.  As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.  Each of these individuals, during his tenure with the Company, was involved in drafting, producing, reviewing, and/or disseminating the statements at issue in this case, approved or ratified these statements, or was aware but recklessly disregarded that these statements were being issued regarding the Company.

18.     As executive officers of a publicly held company with common stock that was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the federal securities laws, the Individual Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based on accurate information.  The Individual Defendants each violated these requirements and obligations during the Class Period.

19.     The Individual Defendants, because of their positions of control and authority as executive officers of Tempur Sealy, were able to and did control the content of the SEC filings, press releases, and other public statements issued with copies of the statements at issue in this action before they were issued to the public and had the ability to prevent their issuance or cause them to be corrected.  Accordingly, each of these individuals is responsible for the accuracy of the public statement detailed herein.

20.     The Individual Defendants, because of their positions of control and authority as executive officers of Tempur Sealy, had access to adverse undisclosed information about the Company's business, operations, financial statements, and internal controls through access to internal corporate documents, conversations with other Tempur Sealy officers, directors, and employees, attendance at Company management and Board of Directors meetings, and via reports and other information provided to them in connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts and material risks rendered the positive representations made by or about Tempur Sealy false and misleading.

21.     The Individual Defendants are liable as participants in a fraudulent scheme or course of conduct that operated as a fraud or deceit on purchasers of Tempur Sealy's securities by disseminating materially false and misleading statements and/or concealing adverse facts. The scheme: (i) deceived the investing public regarding the Company's products, business, operations, and management, and the intrinsic value of Tempur Sealy's securities; and (ii) caused Lead Plaintiff and members of the class to acquire Tempur Sealy's securities at artificially inflated prices.

- 7 -

## IV.     FACTUAL ALLEGATIONS

### A.     Tempur Sealy's Background and Business Overview

22.     Tempur Sealy is a mattress and bedding-products company that develops, manufactures, markets, and distributes bedding products and sells them in over 100 countries. The Company's brand portfolio includes TEMPUR, Tempur-Pedic, Sealy, Sealy Posturepedic, and Stearns & Foster.

23.     Tempur Sealy's products are divided into two broad categories:  bedding and "other."  The bedding category includes products such as mattresses, foundations, and adjustable foundations, which together represented 91.6% of Tempur Sealy's net sales in 2015 and 92.5% of its net sales in 2016.  The Company's "other" category includes bedding-accessory related products, such as pillows, mattress covers, sheets, and cushions, which together represented 8.4% of the Company's net sales in 2015 and 7.5% of its net sales in 2016.

24.     Tempur Sealy sells its products through two channels:  retail and "other."[2]  The retail channel—which sells furniture and bedding to retailers, department stores, and warehouse clubs—accounts for the vast majority of the Company's sales, representing 91.2% of net sales in 2015 and 89.8% of net sales in 2016.

25.     Tempur Sealy relies heavily on sales to a small number of its top customers in the retail channel.  Indeed, according to the Company's public filings with the SEC, Tempur Sealy's top five customers accounted for approximately 39.4% of the Company's net sales for the year ended December 31, 2015 and 38.7% of its net sales for the year ended December 31, 2016.

26.     Tempur Sealy's largest customer is Mattress Firm—a fact that the Company discloses to investors in its public filings with the SEC.  On February 5, 2016, Mattress Firm

---

[2]     The "other" channel sells directly to consumers through e-commerce platforms, company owned stores and call centers, and to third party, healthcare and hospitality customers and represented 8.8% of net sales in 2015 and 10.2% of net sales in 2016.

acquired HMK Mattress Holdings, LLC ("Sleepy's"), which had also been one of Tempur Sealy's top five customers.  Following the acquisition, Mattress Firm represented an even larger percentage of the Company's net sales:  Mattress Firm and Sleepy's together represented 21.4% and 23.7% of the Company's net sales for 2016 and 2015, respectively.

        **B.**    **Tempur Sealy's Relationship with Mattress Firm**

27.     Throughout the Class Period, Tempur Sealy's relationship with Mattress Firm was governed by certain contracts entered into between Mattress Firm and two of Tempur Sealy's wholly owned subsidiaries:  Sealy Mattress Company ("Sealy") and Tempur-Pedic North America, LLC ("Tempur-Pedic").

28.     The relationship between Sealy and Mattress Firm was governed by a Master Retailer Agreement, entered into on July 11, 2014 and effective January 1, 2014, as well as a 2015-2017 Annual Merchandising Program Agreement, together with certain amendments to these agreements (collectively, the "Sealy Agreement").  The Sealy Agreement provides, among other things, that Mattress Firm is an authorized retailer of Sealy products and obligates Sealy to sell its products to Mattress Firm.

29.     The relationship with Tempur-Pedic and Mattress Firm was governed by a Master Retailer Agreement, entered into on November 25, 2014 and effective January 1, 2014, as well as a 2015-2017 Business Development Program Agreement, together with certain amendments to these agreements (collectively, the "Tempur-Pedic Agreement").  The Tempur-Pedic Agreement provides, among other things, that Mattress Firm is an authorized retailer of Tempur-Pedic products and obligates Tempur-Pedic to sell its products to Mattress Firm.

30.     Tempur Sealy informed investors that it had these long-term contracts with Mattress Firm (and, by extension, that it had a long-term relationship with Mattress Firm), and explained that maintaining its long-term relationship with Mattress Firm was crucial to the

Company's profitability.  Indeed, the Company's Form 10-K for the fiscal year ended December 31, 2015 stated:  "we have a long-term supply agreement in place with Mattress Firm, which we have recently extended.  The loss of one or more of these customers could negatively impact our profitability."

31.     As detailed more thoroughly below in Section IV.G., a lawsuit Mattress Firm filed against Tempur Sealy in March 2017 revealed that, unbeknownst to the public at the time, **_beginning in early 2016_**, Tempur Sealy "**_threatened to cancel the existing agreements_** unless Mattress Firm agreed to revise or renegotiate their existing deal to incorporate economic terms that were increasingly favorable to Tempur Sealy."  According to that lawsuit, Tempur Sealy began demanding more favorable terms from Mattress Firm to "capitalize on Mattress Firm's efforts to grow as a company," such as Mattress Firm's acquisition of Sleepy's in February 2016, and Mattress Firm initially had limited ability to rebuff Tempur Sealy's extreme demands because of its weak bargaining position.  The market was unaware that, beginning in early 2016, Tempur Sealy had issued this ultimatum and been relying on this aggressive negotiating tactic.

   **C.     Mattress Firm's Acquisition of Sleepy's**

32.     Mattress Firm's acquisition of Sleepy's was an important part of Mattress Firm's efforts to grow as a company and increase its national footprint.  The deal provided Mattress Firm with over 20% market share, but also resulted in Mattress Firm facing certain short-term challenges as a result of its efforts to integrate the Sleepy's stores.

33.     After the deal was announced, analysts discussed the benefits of the acquisition and that it was a key part of Mattress Firm's growth strategy.  Analysts at SunTrust, for instance, published a report on November 30, 2015 that stated:

> **Why Buy Sleepy's?  Completes First "Coast to Coast" Retailer With Dominate Share.**  The resulting combination will have stores in virtually every state and the #1 market share in 90% or

more of its individual markets.  Sleepy's adds the Northeast to [Mattress Firm]'s mix (where they had a limited presence) with long-established brands and very attractive real estate.  ***We believe that the move culminates the acquisition strategy that [Mattress Firm] set out on some time ago and has been well articulated since going public.  Upon closing, the combined entity will have roughly just over 21% market share, with no competitor over low-single-digit market share***.

34.     Likewise, analysts at PiperJaffray issued a report on November 30, 2015 that discussed the enhanced buying power Mattress Firm would have as a result of the transaction:

On the positive side, [Mattress Firm] presented an accretive deal in the near- and long-term, which has $40M of cost synergies and we believe provides [Mattress Firm] with significant scale in the industry to leverage a >20% market share into greater buying power and national advertising.  In short, this deal fits well with the long-term growth strategy.

35.     Despite discussing the benefits of the acquisition, analysts also acknowledged that Mattress Firm would likely have to face certain challenges in the short-term.  Indeed, the PiperJaffray report explained:  "To the negative, the acquisition comes when [Mattress Firm] is only in the very early stages of digesting its aggressive acquisition strategy from 2014."

36.     Relatedly, analysts at UBS issued a report on December 1, 2015 that similarly acknowledged that the integration of Sleepy's would be complicated:  "There is no doubt the integration is going to be complicated, especially considering it's in the midst of blending in many other new stores.  But, the potential is definitely there."

37.     Mattress Firm disclosed these risks in its filings with the SEC.  For example, in Mattress Firm's Form 10-K for the fiscal year ended February 2, 2016, filed on April 4, 2016, Mattress Firm detailed in its risk disclosures the integration risks it could face:

We completed our acquisition of Sleepy's in the first week of our fiscal 2016.  If we are unable to fully integrate or successfully manage these acquired businesses or any other business that we acquire, we may not realize anticipated cost savings, improved efficiencies or revenue growth, which may result in reduced

profitability or operating losses.  In addition, we may face competition for acquisition candidates, which may limit the number of acquisition opportunities and may lead to higher acquisition prices.  Moreover, acquisitions of businesses may require the incurrence of additional debt financing or the issuance of additional equity financing, which respectively, could affect our credit rating and ability to obtain financing on favorable terms, or would result in the dilution of our existing stockholder base.  The realization of all or any of the risks described above could materially and adversely affect our reputation and our results of operations.

\*\*\*\*

We expect that the integration of Sleepy's into our internal controls over financial reporting will require significant time and resources from our management and other personnel and will increase our compliance costs.

38.     Tempur Sealy took advantage of Mattress Firm's vulnerability during its non-public negotiations with Mattress Firm and began demanding more favorable terms in early 2016, when Mattress Firm's integration of Sleepy's was just beginning.

### D.    Mattress Firm is Acquired By Steinhoff, a Vertically Integrated Mass-Market Retailer, and Flips the Script on Tempur Sealy's Negotiating Tactics

39.     Unbeknownst to investors, the ultimatum delivered by Tempur Sealy, and the more and more exacting economic conditions it sought to impose from the beginning of 2016, put in jeopardy the Company's ability to continue its relationship, and renegotiate its contracts, with Mattress Firm.  The risk that the contracts would be cancelled became heightened on August 7, 2016, when news reports revealed that Mattress Firm had entered into a definitive merger agreement with Steinhoff International Holdings N.V. ("Steinhoff"), pursuant to which Steinhoff would acquire Mattress Firm for $64.00 per share in cash, representing a total equity value of approximately $2.4 billion (the "Mattress Firm Acquisition").  Mattress Firm issued a press release the next day officially announcing the merger.

40.     Steinhoff—a German international retail holding company—is well known for its vertical integration.  Steinhoff's acquisition of Mattress Firm meant that Mattress Firm now had enhanced buying power and a more favorable negotiating position than it had in early 2016, when Tempur Sealy had the upper hand and threatened to cancel the parties' contracts unless Mattress Firm agreed to "terms that were increasingly favorable to Tempur Sealy."

41.     Indeed, Steinhoff described itself, in an analyst and media presentation discussing the Mattress Firm Acquisition, as a "vertically integrated, diversified international mass market retailer focused on household goods and general merchandise products and categories."  The presentation explained that Steinhoff protects its price positioning through a "vertical integration of [its] supply chain."

42.     This vertically integrated business approach applied to Steinhoff's existing mattress operations, which Steinhoff expanded significantly as a result of the Mattress Firm Acquisition.  As it explained in the analyst and media presentation: "Steinhoff is a strong competitor globally in mattresses and bedding[] through vertically integrated operations."

43.     In discussing Steinhoff's rationale for the acquisition, the presentation stated: "The acquisition of [Mattress Firm] provides Steinhoff the opportunity to enter the ~$80 billion North American home furniture and bedding retail market in a core product segment – mattresses and bedding. . . .  [Mattress Firm] provides an attractive value proposition to Steinhoff due to its compelling industry dynamics, strong US market position, a proven profitability track record, the opportunity for further growth, and [Mattress Firm]'s strong management team."  In addition, the acquisition would allow Steinhoff to "capture [the] benefits of national scale over time" and "[i]ncrease store volumes and margins."

- 13 -

44.     Steinhoff's CEO, Markus Jooste, further explained that the Mattress Firm

Acquisition would give it access to the U.S. market and a national supply chain:

> The boards of Steinhoff and our management team are enthusiastic
> about the opportunities this transaction creates.  ***This transaction
> will allow Steinhoff to not only to enter the U.S. Market with an
> industry leading partner and a national supply chain, but it will
> also expand Steinhoff's global market reach in the core product
> category of mattresses.  The Mattress Firm brand and specialty
> retail concept are a strong compliment to the Steinhoff group
> retail brand portfolio in the many geographies where the group
> operates***.

45.     Mattress Firm's Executive Chairman and Chairman of its board of directors,

Steve Stagner, similarly described the benefits of the acquisition:

> The Mattress Firm board believes that the transaction provides
> significant value to our stockholders through the premium to our
> share price and the immediate liquidity at closing, ***while giving
> Mattress Firm an ideal partner for the future with proven track
> record in the complete mattress supply chain including the retail
> and manufacture of mattresses***.  Steinhoff's management team
> shares our vision for the growth and expansion of Mattress Firm
> and, as such, we believe they are the right long-term partner for our
> customers, employees, suppliers and other stakeholders.

46.     The Mattress Firm Acquisition became effective on September 16, 2016.

47.     Analysts covering Mattress Firm and Steinhoff discussed the merger and the

impact it would likely have on mattress manufacturers and suppliers.  For example, analysts at

SunTrust issued a report on August 7, 2016 explaining that Steinhoff's vertical-integration model

would likely "put pressure" on U.S. mattress manufactures, like Tempur Sealy:

> <u>Vertical Integration of [Steinhoff] Raises Questions For Mattress
> Suppliers</u>.
>
> ***One of the hallmarks of [Steinhoff] is that they produce many of
> their own products, particularly mattresses***. This is particularly
> true in France and the UK (11% of sales) where they are both a
> major manufacturer and retailer. ***This is in direct contrast with
> [Mattress Firm] that has been a retail only concept.  While we
> expect a long integration period, the move does raise the question***

- 14 -

> *if [Steinhoff] longer-term moves to a more vertical model in the*
> *US. This would put pressure on the major US manufacturers*
> *including Tempur Sealy (TPX, $77.32 , Neutral), of which*
> *MFRM represents 25% of sales,* and the largest industry producer
> Serta Simmons Bedding.

48.     Likewise, analysts at Deutsche Bank issued a report on August 19, 2016, which

explained that the Mattress Firm Acquisition would provide Mattress Firm greater negotiating

and enhanced buying power with suppliers, including Tempur Sealy:

> **Synergies [from Steinhoff's acquisition of Mattress Firm] are**
> **likely to emerge over the mid to longer term.**
>
> The acquisition of Mattress Firm would represent Steinhoff's first
> entry into the US market, though not into the mattress business
> where in both retail and manufacturing it has a significant presence
> in Europe already. ***Mid-term we believe better negotiating power***
> ***and upstream component sourcing provides the biggest scope for***
> ***cost synergies***. Downstream the main attraction is access to a scale
> retail and last-mile home delivery platform nationwide in the
> world's largest market. This could allow Steinhoff to introduce
> other formats to US in the longer term. Removing Mattress Firm
> from direct quarterly public scrutiny should also allow retained
> management to better address recent operating issues and complete
> its own integration of past acquisitions.
>
> ***
>
> Mattress Firm, via the acquisition of Sleepy's already commands a
> 25% share of the US mattress market. In FY15/16 79% of its sales
> were derived from product supplied by two manufacturers: Tempur
> Sealy (DBe 52%) and Serta Simmons (27%). ***According to***
> ***Tempur Sealy's last 10K the combined Mattress Firm business***
> ***also accounted for 25% of its group revenues. We believe***
> ***Mattress Firm, via its current synergy plans, has likely already***
> ***sought to exert its enhanced buying power***.
>
> However, Steinhoff is already also a customer of these
> manufacturers in their European and other retail markets. For
> example Steinhoff has $500m of mattress retail revenues in UK
> and a similar scale in France on our estimates. The supply chain
> for mattresses is typically very local (Tempur Sealy even has
> factories in Hawaii for that State), but ***there could nevertheless be***
> ***the opportunity to negotiate group over-riders or volume rebates***.

49.     Analysts continued these observations in the months following the Mattress Firm Acquisition.  Analysts at Blueshift Research, in a report published on October 6, 2016, explained that Tempur Sealy would face "challenges from multiple fronts, including from . . . potential fallout from Steinhoff's Mattress Firm acquisition."  The report explained that the acquisition, "***creates a possible threat to Tempur's and Sealy's floor and slotting space, and bargaining power***, in Mattress Firm stores as Steinhoff could use some of the space for private label mattresses ***and/or to negotiate lower slotting fees from [Tempur Sealy]***."

50.     The Mattress Firm Acquisition, and the enhanced buying power that Mattress Firm now had, vastly increased the risk that Mattress Firm, in the face of Tempur Sealy's ultimatum, could actually end their relationship.

51.     Former employees of both Tempur Sealy and Mattress Firm confirm that after the Mattress Firm Acquisition in August 2016 there was an increased risk that the parties' contracts would be terminated.

52.     For example, a former Human Resources Manager at Tempur Sealy (the "Former HR Manager") explained that the Mattress Firm Acquisition impacted her day-to-day responsibilities.  The Former HR Manager, who worked at the Company from August 2015 to February 2017 at the Company's manufacturing location in Richmond, California, was responsible for talent acquisition and finding individuals with skills that matched the needs of the Company in that location.  The Former HR Manager also coordinated with different departments at the Company to formulate strategic and tactical resource planning and recruitment campaigns for the Richmond location.

53.     The Former HR Manager explained that the Company's Human Resources Department held conference calls each month.  These calls were led by the Vice President of

- 16 -

Human Resources, Diana Strickland, and other participants included the four Regional or Senior

Human Resources Managers, as well as the Company's Human Resource Managers, such as the

Former HR Manager and counterparts at other Tempur Sealy manufacturing locations

throughout the United States.

54.     On one such call in mid-to-late November 2016, the Tempur Sealy Human

Resources Managers, including the Former HR Manager, were told to hold off on hiring until

further notice.  According to the Former HR Manager, the reason for this halt on hiring was that

there were "uncertainties" regarding the Company's negotiations with Mattress Firm.  The

Former HR Manager explained that Tempur Sealy historically ramped up hiring in November to

meet Mattress Firm demand in the first quarter of the following year—a time when demand was

typically high because customers had tax refunds to spend on mattresses.

55.     The Former HR Manager also explained that, in early December 2016, the

Company's Vice President of Components & Synergy Projects, Shailesh Patel, and the Director

of Manufacturing Operations at the Richmond location, Patricia Gallardo, confirmed that the

Human Resource Managers should continue to hold off on hiring because the Mattress Firm

negotiations were not going well.  The Former HR Manager explained that the Human Resource

Managers at the Tempur Sealy manufacturing locations that produced a high volume of

merchandise for Mattress Firm were told to hold off on hiring, but manufacturing sites that

produced products for other customers were given the go ahead to continue with the hiring

process in December 2016.

56.     A former Inside Sales Manager (the "Former IS Manager"), who worked at

Mattress Firm in Houston, Texas from January 2003 to October 2016, similarly confirmed that

the negotiations with Tempur Sealy deteriorated after the Mattress Firm Acquisition.  The

Former IS Manager reported to Mattress Firm's Vice President of Multi-Channel Sales, who in turn reported to Mattress Firm's CEO.  The Vice President of Multi-Channel Sales met with the CEO and management on a weekly basis.  The Former IS Manager explained that he was in his manager's "circle of trust", and that the Vice President of Multi-Channel Sales confided in him on certain issues at Mattress Firm.  This included being told in August 2016 that Mattress Firm's contract negotiations with Tempur Sealy were not going well and that there was a real threat that the contracts would be cancelled because both parties took hard lines during the negotiations.

57.     Despite the fact that negotiations had deteriorated following the Mattress Firm Acquisition, Tempur Sealy concealed from investors the increased material risk that it would lose its most important customer, and instead touted the long-term nature of its relationship with Mattress Firm and even future prospects.

### E.     Tempur Sealy Conceals the Material Risk That It Would Have to Terminate Its Relationship with Mattress Firm

58.     Throughout the Class Period, and as detailed more thoroughly below in Section V., Defendants regularly discussed its relationship with Mattress Firm—a relationship that the Company touted as crucial to its financial success—but concealed that the relationship had deteriorated in the lead up to, and especially following, the Mattress Firm Acquisition. Specifically, Defendants failed to disclose the material risk that Company would ultimately terminate its contracts with Mattress Firm as a result of the terms Mattress Firm was capable of demanding after it was acquired, given that Mattress Firm now had a vertically integrated parent company on which to fall back.

59.      Indeed, on September 27, 2016, Tempur Sealy presented at the Deutsche Bank Leveraged Finance Conference, after the market closed.  During that conference, Defendant Thompson discussed the Company's post-market-closing announcement earlier that afternoon

that it would lower its full-year 2016 financial guidance, attributing the reduced forecast to (i) an industry-wide softness in demand; (ii) management mistakenly reducing the Company's promotional days during the third quarter; (iii) management concentrating its advertising efforts on the newly launched TEMPUR-Breeze product at the expense of other products in the Tempur-Pedic product line; and (iv) the acquisition of it its largest customer, Mattress Firm, by Steinhoff, and temporary "transitions" in its business.

60.     Despite explaining that the Mattress Firm Acquisition contributed to the Company's decision to lower its full-year 2016 guidance, Defendant Thompson failed to disclose during the Deutsche Bank Leveraged Finance Conference the long-term implications of the Mattress Firm Acquisition—*i.e.*, that Tempur Sealy would be unable to obtain favorable terms on its contracts with Mattress Firm and the increased material risk that Tempur Sealy would cancel those contracts.  Instead, Defendant Thompson explained that the effects of the acquisition would be temporary, stating that Tempur Sealy was "***very optimistic long term***" about the relationship, despite the acquisition, and that "***within a quarter or two, we'll be back on what I'll call a normal basis***."

61.     On news of the guidance revision, the price of Tempur Sealy's common stock fell $19.21 per share over a two-day period, or more than 25%, on heavy trading volume, to close at $55.24 per share on September 29, 2016.  Had the truth been revealed, the stock price would have fallen even further.

62.     Defendants again concealed the long-term implications of the Mattress Firm Acquisition during an October 27, 2016 earnings conference call to discuss the Company's third quarter 2016 financial results.  During the call, Defendant Thompson discussed Mattress Firm's rebranding of Sleepy's stores and the likely impact of the Mattress Firm Acquisition on Tempur

Sealy's sales, but failed to disclose the impact that the Mattress Firm Acquisition was then having on the Company's contract negotiations with Mattress Firm:

> *I would say is, we think [the rebranding of Sleepy's stores] will be very successful, the transition of the stores*. It's a fluid process. We're not going to talk about their game plan because that's confidential, but I can tell you where they have made the transition in rebranding. The stores have done well. And Tempur Sealy's sales have increased from a balance of share stand point. I think I can say that clearly. *As far as new ownership, look, we work with the Steinhoff Organization worldwide, in general we find them to be outstanding*.

63.     Defendant Thompson also represented on the October 27, 2016 earnings conference call that sales to Mattress Firm would *"improv[e] in 2017*," failing to reveal that Defendants were aware of the increased material risk that the Company's relationship with Mattress Firm would end before that occurred.

64.     Likewise, in the Form 10-Q Tempur Sealy filed on November 4, 2016 for the quarterly period ended September 30, 2016, the Company disclosed that its sales to Mattress Firm had declined that quarter and that the Company expected those sales to decline in the fourth quarter as well, but concealed the long-term implications that the Mattress Firm Acquisition would have on the Company's relationship with Mattress Firm because Tempur Sealy concealed the increased material risk that the contracts would be terminated.

**F.    Tempur Sealy Terminates its Contracts with Mattress Firm**

65.     On January 30, 2017, Tempur Sealy issued a press release in which it announced that the Company had terminated its contracts with Mattress Firm. The press release stated:

> Tempur Sealy International, Inc. (NYSE: TPX, the "Company") announced that during the week of January 23, 2017, senior management of Mattress Firm Holdings Corp. ("Mattress Firm") and representatives of its parent Steinhoff International Holdings N.V. ("Steinhoff"), verbally notified the Company of its intent to terminate all of their contracts with the Company in the United States, if the Company did not agree to considerable changes to

their agreements, including significant economic concessions.  The
Company engaged in discussions to facilitate a mutually agreeable
supply arrangement with Mattress Firm.  However, the parties
were unable to reach an agreement, and the Company issued
formal termination notices for all of the Company's brands to
Mattress Firm as of January 27, 2017.  The Company anticipates it
will cease doing business with Mattress Firm during the first
quarter of 2017.

66.     Analysts and investors were shocked by the announcement.  Indeed, analysts

questioned how investors were not told earlier that negotiations had been deadlocked.  For

example, analysts at PiperJaffray issued a report on January 30, 2017 that expressed frustration

with the lack of transparency and communication regarding the Company's relationship with its

largest customer:

> With its second >20% one day sell-off in less than 5 months,
> [Tempur Sealy] shares are becoming less attractive to long-term
> holders.  ***While margins and cash flow remain impressive, the
> volatility around sales and now termination of its largest
> customer warrants increased transparency and communication
> with shareholders.  We are again disappointed there is no
> conference call this morning***.

67.     Other analysts discussed the significant negative implications the announcement

would have on Tempur Sealy's financials.  Analysts at UBS, for example, in a report published

on January 30, 2017, stated:

> The downside risk associated with [Tempur Sealy]'s customer
> concentration played out a lot faster than expected.  The fact that
> [Tempur Sealy] will stop doing business with Mattress Firm in
> 1Q'17 is likely going to have meaningful near-term and longer run
> ramifications.  Clearly, [Tempur Sealy] is going to see a hefty sales
> and profit hit in '17.  Approximately 21% of [Tempur Sealy]'s
> worldwide sales come from [Mattress Firm] and we believe that is
> closer to 25-30% in the US.  We are placing our rating and price
> target Under Review pending further analysis.
>
> ***
>
> Longer-term, a lack of partnership with [Mattress Firm] means that
> [Tempur Sealy] loses access to a key segment of the marketplace.

> We think this is a material disadvantage at a time when
> competition is rising.  For argument's sake, let's say this is a
> negotiating tactic and the parties can eventually work it out.  The
> situation still shows where the considerable balance of power is in
> the relationship.  Steinhoff has the advantage of its size to push for
> better terms.  Eventually, it might look to pursue a vertical
> integration strategy where it skews a greater portion of its
> assortment towards private label products.  This might potentially
> crowd out [Tempur Sealy] anyway.

68. On news that Tempur Sealy terminated its contracts with Mattress Firm, the price of Tempur Sealy common stock plummeted $20.19 per share over the next two days of trading, or nearly 32%, on extremely heavy trading volume to close at $43.00 per share on January 31, 2017.

### G. **Mattress Firm Sues Tempur Sealy for Breach of Contract**

69. On March 30, 2017, after the close of the Class Period, Mattress Firm filed suit against Tempur Sealy in Texas state court, alleging, among other things, breach of contract arising out of Tempur Sealy's conduct following the announcement that the parties' contractual relationship had ended.

70. The Original Petition setting forth Mattress Firm's claims provided greater detail regarding previously undisclosed contract negotiations.  Specifically, Mattress Firm revealed that, beginning in 2016, Tempur Sealy had threatened in non-public negotiations to cancel its contracts with Mattress Firm, and did so while "Mattress Firm was increasing its national footprint through organic growth and the acquisition of other mattress retailers" such as Sleepy's:

> *From the beginning of 2016—strategically timed to threaten*
> *crucial events in Mattress Firm's business—Tempur Sealy*
> *threatened to cancel the existing agreements unless Mattress*
> *Firm agreed to revise or renegotiate their existing deal to*
> *incorporate economic terms that were increasingly favorable to*
> *Tempur Sealy*.  Mattress Firm acquiesced to several of these

- 22 -

> demands, but Tempur Sealy continued to push for more.  By the
> beginning of 2017, the parties reached an impasse.

71.     The Original Petition therefore reveals that by the beginning of 2016, Tempur

Sealy had threatened to cancel its contracts with Mattress Firm unless Mattress Firm agreed to its

terms, creating a "take-it-or-leave-it" scenario that put its relationship with a key customer at

risk.  Following the Mattress Firm Acquisition, however, it was now Mattress Firm who was

better positioned to demand favorable terms.  It was at that point that Tempur Sealy became

aware of the increased material risk that its contractual relationship with Mattress Firm would

soon end.  Nevertheless, Tempur Sealy concealed this fact from investors.

**V.   DEFENDANTS' MATERIALLY FALSE AND
       MISLEADING STATEMENTS AND OMISSIONS**

72.     Throughout the Class Period, Defendants breached their duty to disclose that the

Company's contractual relationship with its largest customer—a relationship that the Company

touted as important and crucial to its financial success—had deteriorated following the Mattress

Firm Acquisition and concealed the increased material risk that the Company would ultimately

terminate its contracts with Mattress Firm as a result of the terms Mattress Firm was capable of

demanding after it was acquired and its bargaining power increased.  Moreover, despite lowering

its full-year 2016 earnings guidance after the Mattress Firm Acquisition, attributing the decision

in part to the "transitions" Mattress Firm faced after it was acquired, Defendants still failed to

disclose the full extent and long-term implications the Mattress Firm Acquisition would have on

its business prospects.

**A.     September 9, 2016 Registration Statement**

73.     On September 9, 2016, Tempur Sealy filed Amendment No. 1 to a Form S-4

registration statement (the "Registration Statement"), offering to exchange $600 million of

5.500% Senior Notes due 2026 for new 5.500% Senior Notes due 2026 (the "Notes Exchange").

The Registration Statement was declared effective on September 13, 2016.

74.    The Registration Statement included risk disclosures relating to the Company's

significant dependence on sales to its largest customers, and specifically to Mattress Firm:

> Our top five customers, collectively, account for approximately 39.4% of our net sales for 2015.  The credit environment in which our customers operate has been relatively stable over the past few years.  We expect that some of the retailers that carry our products may consolidate, undergo restructurings or reorganizations, experience financial difficulty, or realign their affiliations, any of which could decrease the number of stores that carry our products or increase the ownership concentration in the retail industry. An increase in the concentration of our sales to large customers may negatively affect our profitability due to the impact of volume and other incentive programs related to these customers.  Furthermore, as sales to our large customers grow, our credit exposure to these customers may also increase.  Some of these retailers may decide to carry only a limited number of brands of mattress products, which could affect our ability to sell products to them on favorable terms, if at all.  ***A substantial decrease or interruption in business from these significant customers could result in the loss of future business and could reduce liquidity and profitability***.  In addition, the timing of large purchases by these customers could have an increasingly significant impact on our quarterly net sales and earnings.
>
> ***Mattress Firm Holding Corp., which is represented in the North America segment, is our largest customer***.  On February 5, 2016, Mattress Firm Holding Corp. acquired all of the outstanding equity interests in HMK Mattress Holdings, LLC ("Sleepy's").  Sleepy's operates approximately 1,050 specialty mattress retail stores located in 17 states and the combined company will operate approximately 3,500 stores in 48 states.  Sleepy's was also one of our top 5 customers in 2015 and as a result of this acquisition, based on 2015 net sales, the combined company will be our largest customer, and will represent a significant portion of our overall sales.  ***Mattress Firm and Sleepy's together represented approximately 25% of our overall net sales for 2015.  This higher customer concentration will increase the risks associated with large customers described above***.

75.     Defendants' statements in the Registration Statement were materially false and misleading because Defendants failed to disclose that Tempur Sealy's relationship with Mattress Firm—a relationship that the Company touted as crucial to its financial success—had in fact *already* deteriorated following the Mattress Firm Acquisition.  Moreover, the Registration Statement concealed the increased risk that the Company would ultimately terminate its contracts with Mattress Firm as previously threatened and as a result of the terms Mattress Firm was capable of demanding after it was acquired and its bargaining power increased.

76.     Defendants' omissions violated further disclosure requirements called for by Item 303 of Regulation S-K, 17 C.F.R. § 229.303 ("Item 303"), and Item 503 of Regulation S-K, 17 C.F.R. § 229.503 ("Item 503").  Specifically, (1) Item 303 required the Company to disclose events or uncertainties that were both presently known to management and reasonably likely to have material effects on the Company's financial condition or results of operations, and (2) Item 503 required the Company to include "a discussion of the most significant factors that make the [securities] speculative or risky."

77.     SEC interpretive guidance associated with Item 303 explains that:

> ***Events that have already occurred or are anticipated often give rise to known uncertainties***.  For example, a registrant may know that a material government contract is about to expire.  The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed.  More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed.  The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant.  ***In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required***.

78.     Defendants' statements in the Registration Statement violated Items 303 and 503 because Defendants failed to disclose that Tempur Sealy's relationship with Mattress Firm—a relationship that the Company touted as crucial to its financial success—had in fact *already* deteriorated following the Mattress Firm Acquisition.  Moreover, Defendants' statements in the Registration Statement violated Items 303 and 503 because Defendants concealed the increased risk that the Company would ultimately terminate its contracts with Mattress Firm as previously threatened and as a result of the terms Mattress Firm was capable of demanding after it was acquired and its bargaining power increased.

**B.     September 14, 2016 Prospectus**

79.     On September 14, 2016, after the SEC declared the Registration Statement effective, Tempur Sealy filed a related prospectus with the SEC (the "Prospectus"), which forms part of the Registration Statement.

80.     The Prospectus included the same risk disclosure relating to Mattress Firm that was included in the Registration Statement.  *See* Section V.A., *supra*.

81.     Defendants' statements in the Prospectus were materially false and misleading because Defendants failed to disclose that Tempur Sealy's relationship with Mattress Firm—a relationship that the Company touted as crucial to its financial success—had in fact *already* deteriorated following the Mattress Firm Acquisition.  Moreover, the Prospectus concealed the increased risk that the Company would ultimately terminate its contracts with Mattress Firm as previously threatened and as a result of the terms Mattress Firm was capable of demanding after it was acquired and its bargaining power increased.  As such, the Defendants also failed to disclose (1) material events and known uncertainties that were reasonably likely to have a material adverse effect on its results of operations in violation of the disclosure requirements set forth in Item 303, and (2) significant, then-existing (as opposed to potential) factors that made

the securities more speculative or risky than the Company disclosed in violation of the disclosure requirements set forth in Item 503.

   **C.**   **September 27, 2016 Press Release**

   82.   After the market closed on September 27, 2016, Tempur Sealy issued and filed with the SEC on Form 8-K a press release that provided an update on the Company's full-year 2016 financial guidance (the "September 27, 2016 Press Release").  In the September 27, 2016 Press Release, Defendant Thompson stated:

> Third quarter net sales are below our prior expectations.  We currently expect net sales for the full year to be down 1 to 3 percent as compared to 2015.  For the full year 2016, the Company currently expects Adjusted EBITDA to range from $500 million to $525 million.
>
> While our net sales are below expectations, our operational initiatives are going well and are continuing to drive considerable margin expansion.  The net impact of the revenue shortfall and our continued margin expansion is that we felt it was appropriate to lower the midpoint of our adjusted EBITDA guidance by 5%.  The midpoint of this updated guidance implies an increase in adjusted EBITDA of approximately 12% and approximately 20% growth in adjusted earnings per share compared to 2015.

   83.   Defendants' statements in the September 27, 2016 Press Release were materially false and misleading because Defendants failed to disclose that Tempur Sealy's relationship with Mattress Firm—a relationship that the Company touted as crucial to its financial success—had in fact *already* deteriorated following the Mattress Firm Acquisition.  Moreover, the September 27, 2016 Press Release concealed the increased risk that the Company would ultimately terminate its contracts with Mattress Firm as previously threatened and as a result of the terms Mattress Firm was capable of demanding after it was acquired and its bargaining power increased.  In addition, despite lowering its full-year 2016 earnings guidance, attributing the decision in part to issues Mattress Firm faced after it was acquired, Defendants nevertheless failed to disclose the full

extent and long-term implications the Mattress Firm Acquisition would have on its business

prospects given the ultimatum it had previously issued to the Mattress Firm.

      **D.**      **September 27, 2016 Deutsche Bank Leveraged Finance Conference**

     84.     After the market closed on September 27, 2016, Tempur Sealy presented at the

Deutsche Bank Leveraged Finance Conference.  The presentation was filed with the SEC on

Form 8-K  During the conference, Defendant Thompson discussed the Company's September

27, 2016 Press Release, in which Tempur Sealy revised down its full-year 2016 financial

guidance.  Defendant Thompson provided greater detail about the Company's decision to lower

its guidance, attributing the reduced forecast to a number of factors, including the acquisition of

it its largest customer, Mattress Firm, by Steinhoff, which caused "transitions" in its business.

With respect to the Mattress Firm Acquisition, Defendant Thompson stated:

> ***Also, our largest client, our largest customer, recently got
> purchased.  They are going through some transitions and we are
> feeling some of that transition.  We are very optimistic long term,
> but as they work through rebranding some of their stores, we are
> going to feel some of that***.

     85.     Also during the conference, Defendant Thompson was asked to provide additional

detail on what the Company meant when it attributed its lowered guidance to "transitions"

Mattress Firm was "going through":

> First off, I'm going to be a little bit careful because we don't
> generally talk about individual customers.  But as you'll see in the
> 10-K, they are 25% of our business, so you're going to see activity
> in that footnote anyway.  So I think I can speak and should speak a
> little bit about it.
>
> I would say that, look, first of all, ***we are thrilled with the changes
> they are making***.  We are thrilled with their new ownership and we
> think that they'll be very successful long term.  ***But as you may or
> may not know, they are also rebranding quite a few stores and
> transitioning from the Sleepy's brand to the Mattress Firm
> brand.***

> *That means a lot of stuff moving around, and they're going to have to work through that.  And while they are working through that, we are going to feel some of that, but I think they'll get through that very rapidly.  And within a quarter or two, we'll be back on what I'll call a normal basis*.
>
> Also, we thought originally that the Stearns & Foster product would make it onto Matt Firm's floor in the third quarter.  As I told you before, Stearns & Foster is doing very well.  And we just couldn't fit the production into our factories in a way that made sense for us and made sense for them as they re-floored.
>
> And so we had to push some of that off a month or so into the fourth quarter.  So I'm going to say most of that is on us, but it's – that was a disappointment.

86.     Defendant Thompson also discussed the Company's relationship with Mattress Firm and explained that the Mattress Firm Acquisition would not negatively impact that relationship:

> That's primarily the Sleepy's/Mattress Firm transition.  From an ownership standpoint, look, [Steinhoff] people are outstanding owners.  *They run a decentralized business model, so local management is the same that we've been working with for a decade.  They are fully empowered and we don't see much change from that standpoint*.

87.     Defendants' statements during the September 27, 2016 Deutsche Bank Leveraged Finance Conference were materially false and misleading because Defendants failed to disclose that Tempur Sealy's relationship with Mattress Firm—a relationship that the Company touted as crucial to its financial success—had in fact *already* deteriorated following the Mattress Firm Acquisition.  Moreover, Defendants statements during the September 27, 2016 Deutsche Bank Leveraged Finance Conference concealed the increased risk that the Company would ultimately terminate its contracts with Mattress Firm as previously threatened and as a result of the terms Mattress Firm was capable of demanding after it was acquired and its bargaining power increased.  In addition, despite lowering its full-year 2016 earnings guidance, attributing the

decision in part to the "transitions" Mattress Firm faced after it was acquired, Defendants

nevertheless failed to disclose the full extent and long-term implications the Mattress Firm

Acquisition would have on its business prospects given the ultimatum it had previously issued to

the Mattress Firm.

> **E.**   **October 27, 2016 Press Release and Earnings Call**

88.   On October 27, 2016, Tempur Sealy issued and filed with the SEC on Form 8-K a

press release in which it announced its third quarter 2016 financial results (the "October 27, 2016

Press Release").  In the October 27, 2016 Press Release, Defendant Thompson stated:

> We are pleased to report record EBITDA and GAAP EPS for the
> quarter. The flexibility of our business model was displayed this
> quarter as our top line sales were below our original expectations
> yet we delivered significant margin expansion and 19% EPS
> growth.  We continue to effectively execute on our core strategy to
> drive our long term operating performance.

89.   On October 27, 2016, Tempur Sealy held an earnings conference call to discuss

its third quarter 2016 financial results (the "October 27, 2016 Earnings Call").  During the

October 27, 2016 Earnings Call, Defendant Thompson explained that while sales suffered in the

third quarter and would continue to suffer in the fourth quarter of 2016, due in part to Mattress

Firm's rebranding and remerchandising efforts, sales would improve in 2017, when Mattress

Firm's completes its successful transition of stores:

> The third-quarter sales were down 4.6% year on year on a constant
> currency basis versus the third quarter last year.  This was below
> our expectations.  The sales shortfall is largely due to a 5.8%
> decline in the North America segment.  I'd like to take a minute
> and talk about the factors impacting our top-line results in North
> America.
>
> ***
>
> We believe this air pocket in sales during the third quarter was
> driven largely of the following.  First, it is clear that the retail
> environment in the US in the third quarter, was less robust than we

had expected.  Based on our review of industry data and conversations with industry participants, overall mattress sales in the US were soft during the third quarter.  In addition, to softness, but not limited to the mattress industry, as we've seen similar challenging results in furniture, home appliances, auto retail, and other consumer durable goods.

*Second, we experienced some significant weakness in our largest national account, which is in the process of rebranding and re-merchandising over 1,000 recently acquired stores.  To put this factor in perspective, if we were to exclude the sales of our largest national account, in the third quarter of 2016 and 2015, our US sales would have been flat for the third quarter.  We expect this transition of stores to be very successful, but we also expect it will continue to impact our sales for the remainder of 2016, before improving in 2017.  We are encouraged by the improved Tempur Sealy sales trends in the markets that have already undergone rebranding, and are thrilled to help where we can in this significant transition.*

Third, we made a couple of mistakes in our marketing and sales strategy. For example, our advertising campaign overemphasized our newly launched TEMPUR-Breeze line and neglected to support legacy Tempur products.  This resulted in very strong performance from our TEMPUR-Breeze line of products, but declines in our legacy products as they were not included in the advertising.

Another example of a misstep was our reduction in the number of promotional days around the key Labor Day period, compared to last year. This put us at a disadvantage on the retail floor.  I should also point out that we redesigned our Tempur Labor Day incentives, adding unnecessary complexity.

Lastly, our non-bedding product sales, which include pillows and products sold through our North American joint venture were down $20 million, representing almost half of our North American revenue decline this quarter.  We have mentioned previously that our pillow business needs some attention, and we plan to update you on our plans next quarter.  As for our North America joint venture, we have advised you in the past that the orders are very lumpy, and although the sales were disappointing this quarter, the lumpiness is not uncommon.

90.     During the October 27, 2016 Earnings Call, an analyst asked Defendant

Thompson to discuss Tempur Sealy's relationship with Mattress Firm, since Mattress Firm had

been recently acquired:

> [**Analyst**]: Yes, thank you for taking my question.  My first
> question will be on distribution, and really two parts.  I was hoping
> you could ***talk a little bit more about transition, the rebranding
> that's underway at Mattress Firm and maybe give a little more
> color around how much of an issue may be at the Sleepy's stores
> that are being rebranded***.  And how the floor space is changing,
> are you gaining share as they rebrand the stores?  ***What that
> medium outlook is there? And then part two would be longer-
> term, how you think of the opportunity with Mattress Firm,
> particularly as they are now under new ownership.***  Thank you.

> [**Defendant Thompson**]:  First of all, let me say that I would
> normally never even talk about an individual customer on the
> phone but the FCC requires us to have some financial disclosure of
> that concentration so it's impossible not to.  You will see some of
> that disclosure in the Q that we will be filing.  I think the first thing
> I would say is, ***we think it will be very successful, the transition of
> the stores***.  It's a fluid process.  We're not going to talk about their
> game plan because that's confidential, ***but I can tell you where
> they have made the transition in rebranding. The stores have
> done well.  And Tempur Sealy's sales have increased from a
> balance of share stand point***.  I think I can say that clearly. As far
> as new ownership, look, ***we work with the Steinhoff Organization
> worldwide, in general we find them to be outstanding***.  And our
> balance of share has increased generally worldwide in markets that
> we have worked with them.  And we are wildly optimistic about
> the future for both the Mattress Firm team and Tempur Sealy.

91.     Defendant Thompson also discussed Tempur Sealy's relationships with its closest

clients, including Mattress Firm, stating:  "In the transition stuff, ***we are working closely with

our largest accounts and will continue to work very closely with them*** and make the

investments we need to in people and energy to make that transition successful."

92.     Defendants' statements in the October 27, 2016 Press Release and on the October

27, 2016 Earnings Conference Call were materially false and misleading because Defendants

failed to disclose that Tempur Sealy's relationship with Mattress Firm—a relationship that the

Company touted as crucial to its financial success—had in fact *already* deteriorated following the Mattress Firm Acquisition.  Moreover, Defendants' statements in the October 27, 2016 Press Release and on the October 27, 2016 Earnings Conference Call concealed the increased risk that the Company would ultimately terminate its contracts with Mattress Firm as previously threatened and as a result of the terms Mattress Firm was capable of demanding after it was acquired and its bargaining power increased.

### F.    November 4, 2016 Third-Quarter Form 10-Q

93.    On November 4, 2016, Tempur Sealy filed with the SEC its Form 10-Q for the quarterly period ended September 30, 2016 (the "3Q16 Form 10-Q"), reporting its third quarter 2016 financial results.  The 3Q16 Form 10-Q incorporated the financial results announced in the October 27, 2016 Press Release.

94.    In the 3Q16 Form 10-Q, Tempur Sealy revealed that sales to Mattress Firm had declined in the third quarter of 2016, and revealed that the Company expected them to decline in the fourth quarter as well:

> ***We experienced a decline in sales to Mattress Firm in the third quarter of 2016 as compared to the same period in the prior year, primarily due to the challenging U.S. retail environment, the impact of Mattress Firm's current program of rebranding and remerchandising its newly acquired stores***, and because we did not have our Stearns & Foster® products in the Mattress Firm stores.  In the fourth quarter, we will complete the Stearns & Foster® launch into the Mattress Firm stores.  ***However, we expect our sales to Mattress Firm will also decline in the fourth quarter of 2016 as compared to the same period in the prior year***.

95.    In addition, Item 2 of the 3Q16 Form 10-Q required Tempur Sealy to furnish the information called for under Item 303, *i.e.*, events or uncertainties that are both presently known to management and reasonably likely to have material effects on the Company's financial condition or results of operations.

96.     Further, Item 1A of the 3Q16 Form 10-Q required that Tempur Sealy to "[s]et

forth any material changes from risk factors as previously disclosed" by the Company pursuant

to Item 503, which requires a "discussion of the most significant factors that make the

[securities] speculative or risky."

97.     The 3Q16 Form 10-Q included an updated risk disclosure relating to the Mattress

Firm Acquisition:

> Mattress Firm Holding Corp. ("Mattress Firm"), which was
> acquired by Steinhoff International Holdings N.V. in September
> 2016 and a customer within the North America segment, is our
> largest customer.  In February 2016, Mattress Firm acquired all of
> the outstanding equity interests in HMK Mattress Holdings, LLC
> (Sleepy's), another large customer.  As a result of this acquisition,
> Mattress Firm and Sleepy's combined represented 20.6% and
> 24.0% of our sales for the three months ended September 30, 2016
> and 2015, respectively.  Sales for the combined companies
> represented 21.8% and 24.0% of our sales for the nine months
> ended September 30, 2016 and 2015, respectively.  We
> experienced a decline in sales to Mattress Firm in the third quarter
> of 2016 as compared to the same period in the prior year, primarily
> due to the challenging U.S. retail environment, the impact of
> Mattress Firm's current program of rebranding and
> remerchandising its newly acquired stores, and because we did not
> have our Stearns & Foster® products in the Mattress Firm stores.
> In the fourth quarter, we will complete the Stearns & Foster®
> launch into the Mattress Firm stores.  However, we expect our
> sales to Mattress Firm will also decline in the fourth quarter of
> 2016 as compared to the same period in the prior year.
>
> The risks associated with our largest customers is further described
> in "Risk Factors," under ITEM 1A of Part II and "Management's
> Discussion and Analysis of Financial Condition and Results of
> Operations - Factors That Could Impact Results of Operations"
> included in ITEM 7 of Part II of our Annual Report on Form 10-K
> for the year ended December 31, 2015.

98.     Defendants statements contained in the 3Q16 Form 10-Q were materially false

and misleading because they failed to disclose that Tempur Sealy's relationship with Mattress

Firm—a relationship that the Company touted as crucial to its financial success—had in fact

*already* deteriorated following the Mattress Firm Acquisition.  Moreover, the 3Q16 Form 10-Q concealed the increased risk that the Company would ultimately terminate its contracts with Mattress Firm as previously threatened and as a result of the terms Mattress Firm was capable of demanding after it was acquired and its bargaining power increased.  As such, the Defendants also failed to disclose (1) material events and known uncertainties that were reasonably likely to have a material adverse effect on its results of operations in violation of the disclosure requirements set forth in Item 303, and (2) significant, then-existing (as opposed to potential) factors that made the securities more speculative or risky than the Company disclosed in violation of the disclosure requirements set forth in Item 503.

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

99.    Additional facts give rise to the strong inference of scienter that, throughout the Class Period, Defendants were aware, or recklessly disregarded, the increased and substantial risk that Tempur Sealy and Mattress Firm would not be able to agree to continue their contractual relationship.

100.    First, the Individual Defendants' knowledge of the deteriorating relationship and likelihood that the contracts between Mattress Firm and Tempur Sealy would not be renewed can be inferred because these facts are critical to the Company's core operations.  Mattress Firm was Tempur Sealy's largest customer, and the Company disclosed that it "relie[d] heavily" on sales to Mattress Firm.  Indeed, Tempur Sealy disclosed in its filings with the SEC that a loss of Mattress Firm (and its other top customers) "could negatively impact [the Company's] profitability."  Knowledge of the state of contract negotiations with this important customer can therefore be inferred.  What is more, documents filed in the litigation between Tempur Sealy and Mattress Firm reveal that the Individual Defendants were heavily involved in the contract negotiations, which further strengthens this inference.

101.    Second, during the Class Period, the Individual Defendants reviewed, approved, and signed Tempur Sealy's false and misleading SEC filings and certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 therein (the "SOX Certifications").  These SOX Certifications purported to confirm the accuracy of the financial statements and stated that the Company had designed effective internal controls that "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."  Because, as detailed herein, the financial statements included material inaccuracies, the SOX Certifications signed by the Individual Defendants were materially false and misleading.

## VII.    LOSS CAUSATION

102.    During the Class Period, as detailed herein, Defendants engaged in a course of conduct that artificially inflated the price of Tempur Sealy's securities and operated as a fraud or deceit on Class Period purchasers of Tempur Sealy's securities by failing to disclose and misrepresenting the material risks detailed herein.  As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Tempur Sealy's securities declined significantly as the prior artificial inflation came out of the Company's securities' prices.

103.    As a result of their purchases of Tempur Sealy's securities during the Class Period, Lead Plaintiff and the other Class members suffered economic loss (i.e., damages) under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused Tempur Sealy's securities to trade at artificially inflated levels throughout the Class Period, with its common stock reaching a high of $79.93 per share on September 9, 2016.

104.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Tempur Sealy's business and prospects.  As the truth about the

Company was revealed to the market, the price of Tempur Sealy's securities fell significantly. These declines removed the inflation from the price of Tempur Sealy's securities, causing real economic loss to investors who had purchased Tempur Sealy's securities during the Class Period.

105.   The declines in the price of Tempur Sealy's securities after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Tempur Sealy's securities negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

106.   During the Class Period, the price of Tempur Sealy securities declined as the true state of Tempur Sealy's operations was revealed to the investing public.  In that regard, from the start of the Class Period to the January 30, 2017 disclosure that Tempur Sealy would terminate its contracts with Mattress Firm, the Company's common stock declined more than 42 percent (from a Class Period high of $79.63 per share to close at $45.49 per share on January 30, 2017).

107.   The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Tempur Sealy's securities and the subsequent significant decline in the value of Tempur Sealy's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII.   <u>PRESUMPTION OF RELIANCE</u>

108.   At all relevant times, the market for Tempur Sealy's securities was efficient for the following reasons, among others:

(a)     Tempur Sealy's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Tempur Sealy filed periodic reports with the SEC and NYSE;

(c)     Tempur Sealy regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Tempur Sealy was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place.

109.    As a result of the foregoing, the market for Tempur Sealy's securities reasonably promptly digested current information regarding Tempur Sealy from all publicly available sources and reflected such information in the price of Tempur Sealy securities.  Under these circumstances, all purchasers of Tempur Sealy securities during the Class Period suffered similar injury through their purchase of those securities at artificially inflated prices, and a presumption of reliance applies.

110.    Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

IX.   **INAPPLICABILITY OF THE STATUTORY SAFE**
      **HARBOR AND BESPEAKS CAUTION DOCTRINE**

111.   The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

112.   Defendants acted with scienter because at the time that they issued public documents and other statements in the Company's name they knew, or with extreme recklessness disregarded, the fact that such statements were materially false and misleading or omitted material facts.  Moreover, Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

113.   As set forth in detail throughout this Complaint, Defendants, by virtue of their control over, and/or receipt of, the Company's materially misleading statements and their positions with the Company that made them privy to confidential proprietary information, used such information to artificially inflate the Company's financial results.  Defendants were informed of, participated in, and knew of the improprieties and unlawful conduct alleged herein and understood their material effect on the Company's business and future prospects.  With respect to non-forward-looking statements and omissions, Defendants knew and recklessly disregarded the falsity and misleading nature of that information, which they caused to be disseminated to the investing public.

114.   Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking

statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.  Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading because they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## X.    CLASS ACTION ALLEGATIONS

115.    Lead Plaintiff brings this action on its own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased or otherwise acquired the publicly traded securities of Tempur Sealy from September 9, 2016 to January 27, 2017, inclusive, and were allegedly damaged thereby (the "Class").  Excluded from the Class are:  Defendants; members of the immediate families of the Individual Defendants; Tempur Sealy's subsidiaries and affiliates; any person who is or was an officer or director of Tempur Sealy or any of the Company's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest; Tempur Sealy's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

116.    The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Tempur Sealy had between approximately 53 million and 58 million shares of common stock outstanding and actively trading on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be

ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class

numbers in the thousands and is geographically widely dispersed.  Record owners and other

members of the Class may be identified from records maintained by the Company or its transfer

agent and may be notified of the pendency of this action by mail, using a form of notice similar

to that customarily used in securities class actions.

117.    Lead Plaintiff's claims are typical of the claims of the members of the Class.  All

members of the Class were similarly affected by Defendants' allegedly wrongful conduct in

violation of the Exchange Act as complained of herein.

118.    Lead Plaintiff will fairly and adequately protect the interests of the members of

the Class.  Lead Plaintiff has retained counsel competent and experienced in class and securities

litigation.

119.    Common questions of law and fact exist as to all members of the Class, and

predominate over any questions solely affecting individual members of the Class.  The questions

of law and fact common to the Class include:

(a)    whether the federal securities laws were violated by Defendants' acts and

omissions as alleged herein;

(b)    whether the statements made to the investing public during the Class

Period contained material misrepresentations or omitted to state material information;

(c)    whether and to what extent the market price of Tempur Sealy's securities

was artificially inflated during the Class Period because of the material misstatements alleged

herein;

(d)    whether Defendants acted with the requisite level of scienter;

(e)     whether the Individual Defendants were controlling persons of the

Company;

(f)     whether reliance may be presumed; and

(g)     whether the members of the Class have sustained damages as a result of

the conduct complained of herein and, if so, the proper measure of damages.

120.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy because, among other things, joinder of all members of the Class

is impracticable.  Furthermore, because the damages suffered by individual Class members may

be relatively small, the expense and burden of individual litigation make it impossible for

members of the Class to individually redress the wrongs done to them.  There will be no

difficulty in the management of this action as a class action.

## XI.    CAUSES OF ACTION

### COUNT I
### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
### AND SEC RULE 10b-5 PROMULGATED THEREUNDER
### (Against Defendant Tempur Sealy and the Individual Defendants)

121.    Lead Plaintiff repeats and re-alleges every allegation set forth above as if fully set

herein.

122.    This Count is asserted on behalf of all members of the Class against Defendant

Tempur Sealy and the Individual Defendants for violations of Section 10(b) of the Exchange

Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

123.    During the Class Period, Defendants disseminated or approved the false

statements specified herein, among others, which they knew or deliberately disregarded were

misleading in that they contained misrepresentations and failed to disclose material facts

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

124.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Tempur Sealy's securities during the Class Period.  As detailed herein, the misrepresentations contained in, or the material facts omitted from, those statements included, but were not limited to the following:

(a)    Defendants' statements about its relationship with Mattress Firm, that sales to Mattress Firm would improve in 2017, and that transitions associated with the Mattress Firm Acquisition would not have a long-term impact, which failed to disclose that Tempur Sealy's relationship with Mattress Firm—a relationship that the Company touted as crucial to its financial success—had in fact *already* deteriorated following the Mattress Firm Acquisition, and which concealed the increased risk that the Company would ultimately terminate its contracts with Mattress Firm as previously threatened and as a result of the terms Mattress Firm was capable of demanding after it was acquired and its bargaining power increased.  As such, the Defendants also failed to disclose in the Registration Statement, Prospectus, and 3Q16 Form 10-Q (1) material events and known uncertainties that were reasonably likely to have a material adverse effect on its results of operations in violation of the disclosure requirements set forth in Item 303, and (2) significant, then-existing (as opposed to potential) factors that made the

securities more speculative or risky than the Company disclosed in violation of the disclosure requirements set forth in Item 503.

(b)     Defendants' statements regarding the Company's guidance revision and attributing that decision in part to the "transitions" Mattress Firm faced after it was acquired, which failed to disclose the full extent and long-term implications the Mattress Firm Acquisition would have on its business prospects.

125.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Tempur Sealy's securities, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, Tempur Sealy's relationship with Mattress Firm and the true status of their contract negotiations; (b) artificially inflate and maintain the market price of Tempur Sealy's securities; and (c) cause Lead Plaintiff and other members of the Class to purchase Tempur Sealy's securities at artificially inflated prices and suffer losses when the true facts became known.

126.    Defendant Tempur Sealy is liable for all materially false and misleading statements made during the Class Period, as alleged above.

127.    The Individual Defendants are liable for the false and misleading statements they made and for which they were responsible, as alleged above.

128.     As described above, the Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Tempur Sealy's securities, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

129.     The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at Tempur Sealy, establish a strong inference that Defendants acted with scienter in making the materially false and misleading statements set forth above during the Class Period.

130.     Lead Plaintiff and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Tempur Sealy's securities, which inflation was removed from their price when the true facts became known.  Lead Plaintiff and the Class would not have purchased Tempur Sealy's securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

131.     As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their purchases of Tempur Sealy's securities during the Class Period.

### COUNT II
### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
### (Against Defendants Thompson and Hytinen)

132.     Lead Plaintiff repeats and re-alleges every allegation set forth above as if fully set herein.

133.    This Count is asserted on behalf of all members of the Class against each of the

Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

134.    During their tenures as officers and/or directors of Tempur Sealy, each of these

Individual Defendants was a controlling person of the Company within the meaning of Section

20(a) of the Exchange Act.  By reason of their positions of control and authority as officers

and/or directors of Tempur Sealy, these Individual Defendants had the power and authority to

direct the management and activities of the Company and its employees, and to cause the

Company to engage in the wrongful conduct complained of herein.  These Individual Defendants

were able to and did control, directly and indirectly, the content of the public statements made by

Tempur Sealy during the Class Period, including its materially misleading financial statements,

thereby causing the dissemination of the false and misleading statements and omissions of

material facts as alleged herein.

135.    In their capacities as senior corporate officers of the Company, and as more fully

described above, the Individual Defendants had direct involvement in the day-to-day operations

of the Company, in reviewing and managing its regulatory and legal compliance, and in its

accounting and reporting functions.  The Individual Defendants signed the Company's SEC

filings during the Class Period, and were directly involved in providing false information and

certifying and/or approving the false statements disseminated by Tempur Sealy during the Class

Period.  As a result of the foregoing, the Individual Defendants, as a group and individually,

were controlling persons of Tempur Sealy within the meaning of Section 20(a) of the Exchange

Act.

136.    As set forth above, Tempur Sealy violated Section 10(b) of the Exchange Act by

its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling

persons of Tempur Sealy and as a result of their own aforementioned conduct, the Individual

Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with,

and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and

Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who

purchased or otherwise acquired Tempur Sealy's securities.  Moreover, as detailed above, during

the respective times these Individual Defendants served as officers and/or directors of Tempur

Sealy, each of these Individual Defendants was culpable for the material misstatements and

omissions made by Tempur Sealy, including such misstatements as the Company's false

financial statements, as set forth above.

137.    As a direct and proximate result of these Individual Defendants' conduct, Lead

Plaintiff and the other members of the Class suffered damages in connection with their purchase

or acquisition of Tempur Sealy's securities.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff, on behalf of itself and the other members of the Class,

prays for judgment as follows:

(a)    Declaring the action to be a proper class action pursuant to

Fed. R. Civ. P. 23;

(b)    Awarding compensatory damages in favor of Lead Plaintiff and the other

Class members against all Defendants, jointly and severally, for all damages sustained as a result

of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Lead Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including attorneys' fees and expert fees; and

(d)    Awarding such equitable, injunctive, and other relief as the Court may

deem just and proper.

## XIII.   **JURY TRIAL DEMANDED**

Lead Plaintiff hereby demands a trial by jury of all issues so triable.


DATED:  August 7, 2017

LABATON SUCHAROW LLP


By:      /s/ Michael W. Stocker
Michael W. Stocker
Alfred L. Fatale III
Ross M. Kamhi
Eric Gottlieb
140 Broadway
New York, New York  10017-5563
Telephone:     (212) 907-0700
Facsimile:     (212) 818-0477
mstocker@labaton.com
afatale@labaton.com
rkamhi@labaton.com
egottlieb@labaton.com

*Lead Counsel for Lead Plaintiff and the
Class*